# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| _____ | ) | 3:12-md-02385-DRH-SCW |
| IN RE: PRADAXA (DABIGATRAN | ) | MDL No. 2385 |
| ETEXILATE) PRODUCTS LIABILITY | ) | |
| LITIGATION | ) | |
| _____ | ) | |
| | ) | |
| SUZANNE MACKIEWICZ, | ) | Civil Action No: 13-50167 |
| On behalf of the Estate of MALACHY HIGGINS, | ) | |
| Deceased and SUZANNE MACKIEWICZ, | ) | |
| Individually, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BOEHRINGER INGELHEIM | ) | |
| PHARMACEUTICALS, INC.; | ) | |
| BOEHRINGER INGELHEIM INTERNATIONAL | ) | |
| GMBH, | ) | |
| Defendants. | ) | |

---

## DEFENDANTS' MOTION FOR PARTIAL
## SUMMARY JUDGMENT ON DESIGN DEFECT CLAIMS

---

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS ................................................................................................... 2

    A.    Pradaxa's Approval ................................................................................... 2

    B.    Development of a Pradaxa Reversal Agent ............................................. 3

    C.    Anti-Coagulation Assays ......................................................................... 4

    D.    Plaintiff's Design Defect Claims ............................................................ 4

SUMMARY JUDGMENT STANDARD ............................................................................. 5

ARGUMENT ....................................................................................................................... 6

I.    Plaintiff's Design Defect Claims are Preempted by Federal Law Because They Require Actions That Defendants Cannot Take Without Prior FDA Approval. ............... 6

    A.    State Law is Preempted When It Requires an Action that Must Receive Prior FDA Approval. ............................................................................... 6

    B.    Plaintiff's Design-Defect Claims are Preempted Because Defendants Cannot Redesign Pradaxa or Market Either a Reversal Agent or Hemoclot Assay Without Prior FDA Approval ................................................... 10

II.    Plaintiff's Design Defect Claims are Preempted Because They Obstruct the Accomplishment and Execution of the Purposes and Objectives of Congress. ............... 13

CONCLUSION .................................................................................................................... 15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Carroll v. Lynch,*
  698 F.3d 561 (7th Cir. 2012) ...................................................6

*Crosby v. Nat'l Foreign Trade Council,*
  530 U.S. 363 (2000)........................................................6, 13

*Drager v. PLIVA USA, Inc.,*
  741 F.3d 470 (4th Cir. 2014) ...............................................10

*Egonmwan v. Cook County Sheriff's Dep't,*
  602 F.3d 845 (7th Cir. 2010) .................................................5

*Faas v. Sears, Roebuck & Co.,*
  532 F.3d 633 (7th Cir. 2008) .................................................5

*In re Fosamax Products Liability Litigation,*
  -- F. Supp. 2d --, 2013 WL 4306434 (S.D.N.Y. 2013)........................10

*Geier v. American Honda Motor Co., Inc.,*
  529 U.S. 861 (2000)....................................................6, 13, 14

*Gonzales v. Raich,*
  545 U.S. 1 (2005)..............................................................6

*Hines v. Davidowitz,*
  312 U.S. 52 (1941)...................................................1, 2, 6, 13

*Lewis v. Abbott Labs.,*
  No. 08 Civ. 7480(SCR)(GAY), 2009 WL 2231701, at *4
  (S.D.N.Y. July 24, 2009) .....................................................8

*Mutual Pharm.Co., Inc. v. Bartlett,*
  133 S. Ct. 2466 (2013)................................................. *passim*

*PLIVA v. Mensing,*
  131 S. Ct. 2567 (2011).................................................. *passim*

*Thompson v. Allergan USA, Inc.,*
  -- F. Supp. 2d --, 2014 WL 308794 (E.D. Mo. Jan. 28, 2014)................10

*Vautour v. Body Masters Sports Indus., Inc.,*
  147 N.H. 150 (2001) ...........................................................8

*Wyeth v. Levine*,
   555 U.S. 555 (2009) .............................................................................................6, 7, 9

*Zogenix, Inc. v. Patrick*,
   Civil Action No. 14-11689-RWZ, 2014 WL 1454696
   (D. Mass. Apr. 15, 2014) ........................................................................................13, 14

**Statutes**

21 U.S.C. § 355(a) ....................................................................................................11

21 U.S.C. § 360e(d)(2)(A) ........................................................................................12

21 U.S.C. § 393(b)(2)(B) ..........................................................................................14

42 U.S.C. § 262(a) ....................................................................................................11

42 U.S.C. § 262(j) .....................................................................................................11

**Other Authorities**

U.S. Const. art. VI, cl. 2 .............................................................................................6

21 C.F.R. § 314.70 ....................................................................................................11

21 C.F.R. § 314.70(b)(2)(i) .....................................................................................9, 11

Fed. R. Civ. P. 56(a) ...................................................................................................5

Local Rule 5.1 ...........................................................................................................17

## INTRODUCTION

Plaintiff Suzanne Mackiewicz ("Plaintiff") asserts various claims arising from her now-deceased father's use of Defendants'[1] stroke-prevention medicine Pradaxa® (dabigatran etexilate). While Plaintiff claims that Defendants failed to warn of the bleeding risk of Pradaxa, she also separately seeks to hold Defendants liable for defectively designing Pradaxa. Although Plaintiff's design defect claims are asserted in a conclusory fashion, discovery proceedings suggest that Plaintiff intends to premise these claims on Defendants' failure to market or develop products that allegedly would have improved the decedent's use of Pradaxa. Specifically, Plaintiff apparently seeks to hold Defendants liable for not developing a reversal agent that would reverse Pradaxa's anticoagulant effects, and for not bringing to market a specific anticoagulation assay to estimate Pradaxa's blood plasma concentration.

These state law claims are preempted because federal law prohibits Defendants from unilaterally marketing a reversal agent or specific anticoagulation assay, or changing Pradaxa's design to incorporate the use of such products, without FDA approval. *See Mutual Pharm. Co., Inc. v. Bartlett*, 133 S. Ct. 2466, 2471 (2013). Plaintiff's claims are also preempted because they necessarily obstruct the FDA's ability to determine which medications should be made available to the public, thereby frustrating "the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). Thus, Defendants are entitled to partial summary judgment on Plaintiff's design defect claims to the extent that they are based on allegations that Defendants did not develop a reversal agent or bring to market a specific assay to estimate Pradaxa's blood plasma concentration.

---

[1] This motion is brought by Defendants Boehringer Ingelheim Pharmaceuticals, Inc. and Boehringer Ingelheim International GmbH (collectively "Defendants" or "Boehringer").

**STATEMENT OF FACTS**

**A.      Pradaxa's Approval**

Pradaxa is a novel oral anticoagulant that reduces the risk of stroke and systemic

embolism in patients with non-valvular atrial fibrillation ("Afib"). *See* Exh. 1 (Pradaxa

Prescribing Information) at § 1.  Afib is a heart disease in which the patient has an irregular

heartbeat and the heart fails to clear blood completely from the heart chamber. *See* Exh. 2,

Deposition of Dr. Klaus Dugi ("Dugi Dep.") at 513:14 - 515:1 (Dec. 16-17, 2013) .  This allows

a clot to form and travel to the brain, causing a stroke. *See id.*

The Food and Drug Administration ("FDA") approved Pradaxa in 2010.  Compl. at ¶ 30.

Pradaxa was the first new oral anticoagulant to be approved in the United States for the

prevention of strokes in Afib patients since the approval of Coumadin, known commonly as

warfarin, more than fifty years ago. *See* Exh. 3 (Coumadin Prescribing Information); Exh. 2

(Dugi Dep.) at 515:2 - 516:18.  Pradaxa was approved in the U.S. at a single dose (150 mg)[2]

based on large-scale clinical study data showing that Pradaxa:  (1) was superior to warfarin in

reducing the risk of stroke; (2) was equivalent to or better than warfarin in its safety profile; and

(3) did not require the same degree of burdensome monitoring, which often led to patients being

undertreated, as warfarin did. *See* Exh. 1 at §§ 2, 6, 14.

---

[2] Pradaxa was also studied in a lower dose, the 110 mg dose.  The data generally indicated that the 110 mg dose lacked the same measure of efficacy as the 150 mg dose but was as effective as warfarin, and that the 110 mg dose had a better safety profile than both the 150 mg dose and warfarin.  The FDA declined to approve the 110 mg dose based on its judgment that approving a less effective dose would "represent[] an undesirable stimulus to use a less-effective regimen and would lead to unnecessary strokes and disability."  B. N. Beasley, et al., *Anticoagulant Options — Why the FDA Approved a Higher but Not a Lower Dose of Dabigatran*, N. Engl. J. Med. 364:1788-1790 (2011).  This brief focuses exclusively on the US-approved 150 mg dose.

### B. Development of a Pradaxa Reversal Agent

All anticoagulants, including Pradaxa, carry a known bleeding risk because the very manner in which they reduce stroke risk -- by inhibiting the formation of stroke-causing clots -- increases the risk of a bleed. *See* Exh. 2 (Dugi Dep.) at 518:7-24.

In the event that a patient on warfarin suffers a bleeding episode, vitamin K can be used to reverse the anticoagulant effect of warfarin over time. *See* Exh. 3 at § 10.2. Because of this, vitamin K is sometimes referred to as an "antidote," or "reversal agent," for warfarin. *See, e.g.,* Compl. at ¶ 36. Significantly, though, this "antidote" reduces the anticoagulant effect of warfarin over a time window that is similar to the window in which Pradaxa naturally leaves the body without any special treatment. *See* Exh. 2 (Dugi Dep.) at 583:9 - 584:3; Exh. 4, Deposition of Dr. Wolfgang Baiker ("Baiker Dep.") at 126:9-13 (Mar. 27, 2014).

The FDA approved Pradaxa for use without a specific reversal agent and approved the warning in Pradaxa's label cautioning that "[t]here is no antidote to dabigatran etexilate or dabigatran." Exh. 5 (Oct. 2010 Pradaxa Prescribing Information) at § 10. The FDA has since approved two additional oral anticoagulants, Xarelto (rivaroxaban) and Eliquis (apixaban), also without a specific reversal agent. *See* Exh. 6 (Xarelto Prescribing Information), Exh. 7 (Eliquis Prescribing Information).

Even without a Pradaxa-specific reversal agent, bleed rates for Pradaxa patients are comparable to, or better than, bleed rates for warfarin patients. In clinical trials, Pradaxa had significantly lower rates of intracranial bleeds, life-threatening bleeds, and total bleeds than warfarin. *See* Exh. 1 at § 6.1 Pradaxa had comparable rates of major bleeds and higher rates of gastrointestinal bleeds. *See id.* Even beyond clinical trials, one recent study demonstrated that the bleeding outcomes with Pradaxa (without an antidote) were better than with warfarin (with the use of vitamin K as an "antidote"). *See* Schulman, S. et al, *Management and Outcomes of*

*Bleeding During Treatment with Dabigatran or Warfarin*, Circulation published online September 30, 2013; Print ISSN: 0009-7322. Online ISSN: 1524-4539. A recent study by the FDA, based on an analysis of post-marketing patient outcomes since Pradaxa's launch, has also confirmed the strong safety profile that was observed in clinical trials. *See* Exh. 8. Notwithstanding its favorable safety profile, since prior to launching Pradaxa, Defendants have devoted substantial resources to developing a Pradaxa-specific reversal agent. *See* Exh. 9.

### C. Anti-Coagulation Assays

In addition to its superior benefit-risk profile, unlike warfarin, Pradaxa does not (1) have numerous drug-food and drug-drug interactions that make its anticoagulant effect unpredictable, or (2) require individualized dose adjustments based on a constant monitoring of the drug's anticoagulant effect. *See* Exh. 1 at §§ 2.1, 2.2, 7; Exh. 3 at §§ 2, 5, 7. Nonetheless there are commercially-available assays, such as the aPTT test, that can be used to determine the level of anticoagulant activity for a Pradaxa patient. *See* Exh. 1 at §§ 2.2, 10, 12.2; Exh. 10, Deposition of Martina Bruckmann ("Bruckmann Dep.") at 418:17-419:10 (Sept. 25-27, 2013).

The Hemoclot test, produced by third-party Hyphen Biomed, is an anticoagulation assay that can provide an indirect measurement of Pradaxa's concentration in the blood. *See id.* at 419:11 - 420:4; Exh. 4 (Baiker Dep.) at 132:18 - 133:15; Exh. 11, Deposition of Dr. Peter Zilles ("Zilles Dep.") at 372:16 - 373:5 (Mar. 20-21, 2014). While the Hemoclot assay is approved and available for clinical use in Europe, it has not been approved by the FDA for clinical use in the United States. *See* Exh. 11 (Zilles Dep.) at 371:13 - 372:3; Exh. 10 (Bruckmann Dep.) at 420:6-17.

### D. Plaintiff's Design Defect Claims

Plaintiff asserts several causes of action based on Pradaxa's alleged design defects, including, *inter alia*, (1) negligence (Compl. at ¶¶ 77-88), (2) strict products liability (*id.* at ¶¶

4

89-113), (3) breach of express warranty (*id*. at ¶¶ 114-124), and (4) breach of implied warranties (*id*. at ¶¶ 125-136).[3]  In asserting these causes of action, Plaintiff alleges that Pradaxa was "unreasonably dangerous" (*id*. at ¶¶ 83, 94, 100), "unsafe," "inherently dangerous," and not "fit for the use intended" (*id*. at ¶¶ 92, 96, 116, 121, 129, 133), and "defective," particularly in its "design" (*id*. at ¶¶ 93, 119, 129, 132).

Although Plaintiff does not expressly identify the nature of the alleged design defects in stating her causes of action, her Complaint asserts that Pradaxa's limitations include the lack of a "readily available reversal strategy" and the lack of a "readily available means for assessing the degree of anticoagulation with dabigatran" (such as the Hemoclot assay).  Compl. at ¶ 65.  Design defect claims premised on these allegations seek to hold Defendants liable for failing to change the design of Pradaxa to include the use of a reversal agent or Hemoclot assay, and for failing to secure FDA approval for these additional products.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (2010).  A "genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party."  *Egonmwan v. Cook County Sheriff's Dep't*, 602 F.3d 845, 849 (7th Cir. 2010) (quoting *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 640-41 (7th Cir. 2008)) (internal quotation marks omitted).  "'[I]rrelevant or unnecessary' factual

---

[3] Separately, Plaintiff has brought several claims based on Defendants' alleged failure to warn the decedent's physicians of the risk of bleeding from Pradaxa, despite Defendants' clear warning from the time of Pradaxa's launch that "PRADAXA increases the risk of bleeding and can cause significant and, sometimes, fatal bleeding."  Exh. 5 at § 5.1; *see* Compl. at ¶¶ 137-203. These claims are addressed in BI's companion motion for summary judgment on the adequacy of Pradaxa's warnings.

disputes do not preclude summary judgment." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012).

## ARGUMENT

Under the Constitution's Supremacy Clause, "the Laws of the United States . . . shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Thus, "if there is any conflict between federal and state law, federal law shall prevail." *Gonzales v. Raich*, 545 U.S. 1, 29 (2005). State laws may be preempted by federal regulations as well as by federal statutes, and tort claims seeking damages are a form of state law that may be subject to preemption. *See, e.g.*, *Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861, 881 (2000).

To the extent Plaintiffs' design defect claims are based on the absence of a reversal agent or specific anticoagulation assay, they are preempted by federal law because they seek to hold Defendants liable for failing to take actions that require prior FDA approval. They are also preempted because they would thwart the FDA's role, established by Congress, as the exclusive authority for determining which medications should be available for patient use. Defendants therefore seek judgment as a matter of law as to these claims.

I.     **Plaintiff's Design Defect Claims are Preempted by Federal Law Because They Require Actions That Defendants Cannot Take Without Prior FDA Approval.**

A.     **State Law is Preempted When It Requires an Action that Must Receive Prior FDA Approval.**

Federal law conflicts with, and therefore preempts, state law when "it is impossible for a private party to comply with both state and federal law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52 (1941)). In recent years, the Supreme Court has applied this principle of impossibility preemption to prescription medications in a series of cases: *Wyeth v. Levine*, 555 U.S. 555 (2009); *PLIVA v. Mensing*, 131 S. Ct. 2567 (2011); and *Mutual Pharmaceutical Co. v. Bartlett*, 133 S. Ct. 2466 (2013). These

cases recognize that, when an entity is not permitted under federal law to *unilaterally* comply with duties imposed by state tort law claims, those claims are preempted. Thus, a state law claim that seeks to hold a defendant liable for its failure to take an action that requires prior FDA approval is preempted.

 1. _Levine_ and _Mensing_

In *Levine,* the plaintiff brought state law failure-to-warn claims against the maker of a brand name drug, arguing that the defendant should have strengthened the warnings in the drug's label. *Levine*, 555 U.S. at 559-60. The defendant argued that these claims were preempted because implementing such a labeling change without FDA approval would violate federal law. *See id*. at 563-64. The Supreme Court rejected the preemption argument, but only because a specific FDA regulation authorized a brand name drug manufacturer "to unilaterally strengthen its warning" without "wait[ing] for FDA approval." *Id*. at 569.

*Mensing* held that similar state law failure-to-warn claims are preempted when asserted against *generic* drug makers. *Mensing*, 131 S. Ct. at 2577-78, 2582. The FDA regulation at issue in *Levine* only authorized *brand* drug manufacturers to unilaterally strengthen a drug's warnings without prior FDA approval. *See id*. at 2575-76. By contrast, if the generic defendants in *Mensing* "had independently changed their labels to satisfy their state-law duty, they would have violated federal law." *Id*. at 2578.

The defendants in *Mensing* were not required to prove that the FDA would have refused the labeling change had they proposed it. *See id.* at 2578-79. *Mensing* made clear that "[t]he question for 'impossibility' is whether the private party could ***independently*** do under federal law what state law requires of it." *Id*. at 2579 (emphasis added). While acknowledging that "it is certainly possible that had the Manufacturers asked the FDA for help, they might have eventually been able to strengthen their warning label," the Court explained that "[i]f these

conjectures suffice to prevent federal and state law from conflicting for Supremacy Clause

purposes, it is unclear when, outside of express pre-emption, the Supremacy Clause would have

any force." *Id.* Applying this reasoning, the Court set forth a broad understanding of federal

preemption:

> [W]hen a party **cannot satisfy its state duties without the Federal Government's
> special permission and assistance**, which is dependent on the exercise of
> judgment by a federal agency, that party cannot independently satisfy those state
> duties for pre-emption purposes.

*Id.* at 2581 (emphasis added). Thus, any state-law claim based on a demand that a party take an

action that requires prior FDA approval -- *i.e.*, "the Federal Government's special permission and

assistance" -- is preempted. *Id.*

    2.  *Bartlett*

*Bartlett* extended the logic of *Mensing* to preempt design defect claims against a drug

manufacturer. *See Bartlett*, 133 S. Ct. at 2474-76. The plaintiff in *Bartlett* asserted a design

defect claim based on a state law "risk-utility" standard "under which 'a product is defective as

designed if the magnitude of the danger outweighs the utility of the product.'" *Id.* at 2474

(quoting *Vautour v. Body Masters Sports Indus., Inc.*, 147 N.H. 150, 153 (2001)).[4] The Court

noted that this would require a redesign of the manner in which the drug at issue was used. *Id.* at

2475 ("In the drug context, either increasing the 'usefulness' of a product or reducing its 'risk of

danger' would require redesigning the drug . . . ."). Federal law, however, prohibits drug

manufacturers from unilaterally changing the design of a drug:

> Once a drug -- whether generic *or brand-name* -- is approved, the manufacturer is
> prohibited from making any major changes to the 'qualitative or quantitative

---

[4] New York law, which governs the Plaintiff's claims in this case, also employs the "risk-utility" standard
for design defect claims. *Lewis v. Abbott Labs.*, No. 08 Civ. 7480(SCR)(GAY), 2009 WL 2231701, at *4
(S.D.N.Y. July 24, 2009).

formulation of the drug product, including [in]active ingredients, or in the specifications provided in the approved application.'

*Id.* at 2471 (quoting 21 C.F.R. § 314.70(b)(2)(i)) (emphasis added).[5]  The redesign demanded by the plaintiff's claims could only be undertaken with prior FDA approval.  *See id.*  Thus, the Court concluded that any claims premised on the defendant's failure to change the drug's design were preempted.  *See id.* at 2477, 2479 ("[S]tate-law design-defect claims . . . that place a duty on manufacturers to render a drug safer by either altering its composition or altering its labeling are in conflict with federal laws that prohibit manufacturers from unilaterally altering drug composition or labeling.").

Although the defendant in *Bartlett* was a generic drug manufacturer, *Bartlett*'s reasoning and holding apply with equal force to claims against brand drug manufacturers.  As *Bartlett* recognized, federal law expressly forbids *both* brand and generic manufacturers from altering the formulation or specification of their FDA-approved drugs without prior FDA approval.  *See Bartlett*, 133 S. Ct. at 2471.  Unlike with label changes, there is no specific FDA regulation that authorizes brand drug makers to unilaterally implement a *design change* while awaiting FDA approval.

*Bartlett*, like *Levine* and *Mensing* before it, stands for the proposition that where state-law liability is predicated on the defendant's failure to take an action that it cannot unilaterally take under federal law, the state law claim is preempted.  State law claims against a pharmaceutical manufacturer are therefore preempted when the manufacturer cannot unilaterally make the changes a plaintiff seeks without the FDA's prior approval.

---

[5] 21 C.F.R. § 314.70(b)(2)(i) states: "(b) Changes requiring supplement submission and approval prior to distribution of the product made using the change (major changes) . . . include, but are not limited to . . . changes in the qualitative or quantitative formulation of the drug product, including ***in***active ingredients, or in the specifications provided in the approved application . . . ."  (emphasis added).  *Bartlett* appears to have accidentally omitted "in" in "inactive."

3. <u>Lower Court Decisions Applying *Bartlett* and *Mensing*</u>

Following this line of Supreme Court cases, several lower courts have held claims preempted when they seek to punish a defendant for taking action that requires advance FDA approval. *See Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 478 (4th Cir. 2014); *Thompson v. Allergan USA, Inc.*, -- F. Supp. 2d. --, 2014 WL 308794, at *6 (E.D. Mo. Jan. 28, 2014); *In re Fosamax Products Liability Litigation*, -- F. Supp. 2d --, 2013 WL 4306434 (S.D.N.Y. 2013). For example, one federal court, relying on *Bartlett*, preempted a claim which argued that a brand drug manufacturer could be liable for putting too much drug substance into its vials, and thereby overcharging for the product, because changing the volume of the vials required federal approval. *See Thompson*, -- F. Supp. 2d --, 2014 WL 308794, at *6 ("Thus, if Defendants were unable, under federal law, to independently lower the volume in each vial of Restasis to be in compliance with the state duties alleged by Plaintiff, Plaintiff's state claims would be preempted.").

These courts have been clear in holding that a manufacturer need not prove that it would have been unsuccessful had it sought agency approval: "This Court must follow the Supreme Court in rejecting the notion that '[m]anufacturers cannot bear their burden of proving impossibility because they did not even try to start the process that might ultimately have allowed them to [comply with state law].'" *Thompson*, -- F. Supp. 2d --, 2014 WL 308794, at *6 (quoting *Mensing*, 131 S. Ct. at 2579).

**B.      Plaintiff's Design-Defect Claims are Preempted Because Defendants Cannot Redesign Pradaxa or Market Either a Reversal Agent or Hemoclot Assay Without Prior FDA Approval.**

Design defect claims premised on allegations that Pradaxa is "unreasonably dangerous," "unsafe," and not "fit for the use intended" in the absence of a reversal agent or the Hemoclot assay are preempted because Defendants must secure prior FDA approval before (1) making a

major change to Pradaxa's design and (2) marketing a new product like a reversal agent or the Hemoclot assay.

Before marketing a brand name drug in interstate commerce, a manufacturer must obtain FDA approval of a New Drug Application ("NDA"). 21 U.S.C. § 355(a). After approval, manufacturers are "prohibited from making any major changes to the 'qualitative or quantitative formulation of the drug product, including [in]active ingredients, or in the specifications provided in the approved application.'" *Bartlett*, 133 S. Ct. at 2471 (quoting 21 C.F.R. § 314.70(b)(2)(i)). To make any such change to an approved NDA, a manufacturer must submit, and secure FDA approval of, a supplemental NDA ("SNDA"). 21 C.F.R. § 314.70.

Here, the FDA approved the original NDA for Pradaxa without any requirement that it be marketed or used alongside a reversal agent or the Hemoclot test. *See* Exh. 5. Indeed, the FDA-approved label specifically (1) warns that Pradaxa has no reversal agent and (2) states that measurements of anticoagulation are generally unnecessary, but that the existing assays identified in the label suffice for any such purpose. *See* Exh. 1 at §§ 2.2, 5.2. Defendants could not have changed the design of Pradaxa to require that it be used alongside a reversal agent or the Hemoclot assay, in order to satisfy a state common law duty, without prior FDA approval of an SNDA. Any claims based on their failure to do so are thus preempted.

Moreover, both the reversal agent and Hemoclot assay are themselves products which require FDA approval in order to be marketed and used for clinical purposes. The reversal agent that the company is currently developing for Pradaxa qualifies as a "biologic." *See* 42 U.S.C. § 262(j). A manufacturer seeking to market a brand name biologic must submit to the FDA a Biologic License Application ("BLA"), which the FDA may approve only upon a determination that the biologic "is safe, pure, and potent." 42 U.S.C. § 262(a). The Hemoclot assay,

manufactured by third-party Hyphen Biomed, is a medical device and is therefore subject to the

FDA's "premarket approval" process, which, just like the NDA approval process for drugs,

requires the applicant to demonstrate a "reasonable assurance" that the device is "safe . . . [and]

effective under the conditions of use prescribed, recommended, or suggested in the proposed

labeling thereof." 21 U.S.C. § 360e(d)(2)(A).

The FDA has not approved either a reversal agent for Pradaxa or the Hemoclot assay for

clinical use in the United States. To the extent Plaintiff's design defect claims are based on the

unavailability of these products, they would impose a state law duty on Defendants to bring the

reversal agent or Hemoclot assay to market. Because Defendants cannot do so "without the

Federal Government's special permission and assistance, which is dependent on the exercise of

judgment by a federal agency" -- namely, the FDA -- they cannot "independently satisfy those

state duties for pre-emption purposes." *Bartlett*, 133 S. Ct. at 2581.

The impossibility of marketing a reversal agent or Hemoclot test, or altering the design of

Pradaxa, without prior FDA approval leaves Plaintiff with the argument that to avoid state-law

liability Defendants must stop selling Pradaxa altogether until it secures such FDA approval.

*Bartlett*, however, squarely rejected the argument that a drug manufacturer could comply with

both federal and state law by simply ceasing to sell the drug in question. The Supreme Court's

"pre-emption cases presume that an actor seeking to satisfy both his federal- and state-law

obligations is not required to cease acting altogether in order to avoid liability. Indeed, if the

option of ceasing to act defeated a claim of impossibility, impossibility pre-emption would be

'all but meaningless.'" *Id.* at 2477 (quoting *Mensing*, 131 S. Ct. at 2579).

Consequently, the only question that is relevant to the preemption inquiry is whether

Defendants could unilaterally alter Pradaxa's design or market a reversal agent or Hemoclot

assay under federal law.  Clearly they cannot.  Plaintiff's state-law claims based on Pradaxa's

lack of a reversal agent or an assay like the Hemoclot test fail, therefore, as a matter of law.

## II.     Plaintiff's Design Defect Claims are Preempted Because They Obstruct the Accomplishment and Execution of the Purposes and Objectives of Congress.

Plaintiffs' design defect claims are also preempted for a second and independent reason --

they would obstruct the FDA's ability to make available to healthcare providers and patients a

range of treatment options that the FDA has found to be safe and effective.

State law is preempted when it "'stands as an obstacle to the accomplishment and

execution of the full purposes and objectives of Congress.'"  *Crosby v. Nat'l Foreign Trade

Council*, 530 U.S. 363, 373 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52 (1941)).  The

Supreme Court has embraced the principle of obstacle preemption in barring claims similar to

the design defect claims at issue here.  In *Geier v. American Honda Motor Co., Inc.*, 529 U.S.

861 (2000), the Court held that state tort law claims that imposed liability on a car manufacturer

for failing to install airbags conflicted with a U.S. Department of Transportation regulation that

did not require airbags for all cars and instead provided manufacturers a range of choices among

passive restraint systems.  *See id.* at 886.  DOT had weighed and balanced various factors in

deciding to allow manufacturers the choice to install airbags.  *See id.* at 874-78.  Because the

plaintiffs sought to impose liability for the failure to install an airbag, their claim presented an

obstacle to achieving "the variety and mix of devices that federal regulation sought" and "the

gradual passive restraint phase-in that the federal regulation deliberately imposed."  *Id.* at 881.

*Geier* has been applied specifically in the context of pharmaceutical products.   In

*Zogenix, Inc. v. Patrick*, Civil Action No. 14-11689-RWZ, 2014 WL 1454696, (D. Mass. Apr.

15, 2014), the court held that an order by a state executive agency prohibiting the prescribing and

dispensing of an FDA-approved drug was preempted.  *See id.* at *2.  Congress had charged the

FDA with "'protect[ing] the public health' by making sure that 'drugs are safe and effective'" and granted the FDA the "authority to approve for sale a range of safe and effective prescription drugs." *Id*. at *2 (quoting 21 U.S.C. § 393(b)(2)(B)). Relying on *Geier*, the court concluded that the state's attempt to substitute its own determinations as to a drug's safety or efficacy "undermine[d] the FDA's authority to make drugs available to promote and protect the public health" and was therefore preempted by federal law. *Id*.

Just as the *Geier* plaintiffs argued "that, to be safe, a car must have an airbag," Plaintiff's design defect claims appear premised on allegations that to be safe, Pradaxa must have a reversal agent or Hemoclot assay. However, the FDA has concluded that Pradaxa is safe and effective -- and should therefore be available for patient use -- without a marketed reversal agent or an additional anticoagulation assay like the Hemoclot test. The FDA made this judgment based on science that self-evidently supported the judgment, showing Pradaxa to work better than warfarin with at worst comparable bleeding rates. Similar to DOT in *Geier*, the FDA was specifically aware of the lack of a reversal agent and the anticoagulation assays available on the market. It nonetheless approved Pradaxa as it was designed, exercising its authority to offer "a range of safe and effective prescription drugs" and "make drugs available to promote and protect the public health." *Zogenix*, 2014 WL 1454696 at *2.

As in *Geier*, the FDA's approval of Pradaxa gave healthcare providers multiple treatment options for reducing the risk of stroke in Afib patients. Prior to Pradaxa, warfarin had been the only medication indicated to reduce the risk of stroke for Afib patients. Clinical studies submitted to the FDA demonstrated that Pradaxa (1) was superior to warfarin at reducing the risk of stroke, (2) was equivalent to or better than warfarin in its safety profile, and (3) did not require the same degree of burdensome monitoring as warfarin. With Pradaxa on the market, doctors

and patients have a choice between an oral anticoagulant that has a known reversal agent and one that does not; one that negatively interacts with commonly ingested drugs and foods and one that does not; and one that requires regular blood testing and one that does not. A state law rule that Pradaxa cannot be sold without another design, known reversal agent, or Hemoclot assay would obstruct the FDA's exercise of its authority -- as established by Congress -- to provide this range of safe and effective medication options.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court grant their motion for partial summary judgment.

Respectfully submitted,
*/s/ Paul W. Schmidt*
Paul W. Schmidt (DC # 472486)
Michael X. Imbroscio (DC # 445474)
COVINGTON &BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004
Phone: (202) 662-6000
Fax: (202) 662-6291
pschmidt@cov.com
mimbroscio@cov.com

Dan H. Ball (# 6192613)
BRYAN CAVE LLP
211 North Broadway, Suite 3600
St. Louis, MO 63102-2750
Phone: (314) 259-2000
Fax: (314) 259-2020
dhball@bryancave.com

Eric E. Hudson (TN # 022851)
BUTLER, SNOW, O'MARA,
STEVENS & CANNADA, PLLC
6075 Poplar Avenue, Suite 500
Memphis, TN 38119
Phone: (901) 680-7200
Fax: (901) 680-7201
eric.hudson@butlersnow.com

*Attorneys for Defendant Boehringer*
*Ingelheim Pharmaceuticals, Inc.*

Beth Rose (NJ # 028491987)
SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza
Newark, New Jersey 07102
Phone: (973) 643-5877
brose@sillscummis.com

*Attorney for Defendant Boehringer*
*Ingelheim International GmbH*

## CERTIFICATE OF SERVICE

Pursuant to Local Rule 5.1 and Case Management Order No. 1, Paragraph 5, I hereby certify that, on June 10, 2014, a copy of the foregoing document (including attached exhibits) was filed through the Court's ECF system. Notice of this filing will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF).

_/s/ Paul Schmidt_
Paul Schmidt